CHUTICH, Justice.
*513 This appeal presents two issues. First, whether claims brought against the manufacturer of a component part of an improvement to real property fell under an exception to the 10-year statute of repose because the improvement was either "equipment or machinery installed upon real property." See Minn. Stat. § 541.051, subd. 1 (a), (e) (2016). Second, whether the same manufacturer had a duty to warn consumers of its product's alleged defect after the time of sale.
Appellant McMillan Electric Company manufactured the motor in a home's heat-recovery ventilator. Sixteen years after the ventilator was installed, a fire started in the ventilator and caused substantial property damage to the home. After paying its insured's losses, respondent Great Northern Insurance Company, the insurer of the homeowners, brought this subrogation action against McMillan and others. It asserted tort, negligence, and warranty claims, including a claim for breach of a post-sale duty to warn. The district court granted summary judgment to McMillan, concluding that the 10-year statute of repose for improvements to real property barred every claim except the claim alleging a post-sale duty to warn. That claim was also dismissed upon summary judgment because the court concluded that McMillan did not have such a duty. The court of appeals reversed and remanded.
We now affirm in part, reverse in part, and remand to the district court for further proceedings. Under the plain language of section 541.051, we conclude that the ventilator containing McMillan's motor is "machinery installed upon real property" and affirm the court of appeals' holding reinstating Great Northern's breach-of-warranty, negligence, and product-liability claims. Because we conclude that McMillan did not have a post-sale duty to warn users of the ventilator of a potential fire hazard, we reverse the court of appeals' decision on that issue.
FACTS
Two homeowners worked with a contractor to build a new home in Eden Prairie. A subcontractor installed two Honeywell HR200 Model 2355 ventilators into the heating, ventilation, and air conditioning ("HVAC") system in the home's original construction. The ventilators contained two fans, two air filters, a heat-exchange core, two ventilation openings, and a motor manufactured by McMillan. The owners moved into the home shortly after its completion in April 1996. The ventilators stayed in place year-round and operated continuously as part of the HVAC system.
Although the ventilators carried the name of Honeywell International, Inc., the ventilators were actually designed and manufactured by Nutech R. Holdings Inc., a Canadian company. From 1992 to 1998, Nutech contracted with McMillan to manufacture custom motors for Nutech's ventilators. Nutech distributed the ventilators to purchasers in Canada and contracted with Honeywell to distribute the ventilators under Honeywell's name in the United States. Overall, Honeywell distributed around 18,000 Nutech ventilators containing McMillan's custom motors to American consumers, and Nutech distributed around 48,000 of the same ventilators in Canada. The ventilators came with a warranty and had to comply with industry performance standards.
On May 19, 2012-16 years after the construction of the home and slightly less than 2 years before Great Northern *514 brought this action-a fire occurred in one of the home's ventilators. The fire caused substantial property damage to the home, but no one was injured. The homeowners filed an insurance claim for their losses, and Great Northern paid their claim in full. Great Northern suspected that the ventilator's motor had caused the fire.
Great Northern, as subrogee of the homeowners, sued McMillan and others.[1] It asserted claims for product liability, breach of warranty, and negligence, including a claim for breaching a post-sale duty to warn consumers of the risk of fires in motors installed in Nutech ventilators. McMillan moved for summary judgment, arguing that the claims were barred by the 10-year statute of repose for improvements to real property under section 541.051, subdivision 1(a).[2] Great Northern, however, asserted that the statute's exception for "equipment or machinery installed upon real property" under subdivision 1(e) applied, so the claims should survive. Minn. Stat. § 541.051, subd. 1(e).
The district court granted McMillan's motion for summary judgment. It determined that the 10-year time bar under section 541.051, subdivision 1(a), applied to Great Northern's claims of negligence, product liability, and breach of warranty, but not to its claim of a post-sale duty to warn because that claim did not relate to the construction of an improvement to real property. The district court next concluded, as a matter of law, that McMillan did not have a post-sale duty to warn.[3]
The court of appeals reversed and remanded for further proceedings on all of Great Northern's claims, including the claim of a post-sale duty to warn. Great N. Ins. Co. v. Honeywell Int'l, Inc. , 895 N.W.2d 255, 259 (Minn. App. 2017). We granted McMillan's petition for review.
ANALYSIS
On appeal from summary judgment, we review de novo "whether there are any genuine issues of material fact and whether the district court erred in its application of the law to the facts." Commerce Bank v. W. Bend Mut. Ins. Co. , 870 N.W.2d 770, 773 (Minn. 2015). Here, we review de novo (1) the meaning of the statute of repose for improvements to real property and (2) whether a legal duty to warn exists when a product manufacturer *515 discovers a defect after the time of sale. See Foss v. Kincade , 766 N.W.2d 317, 320 (Minn. 2009) (reviewing de novo the existence of a legal duty); State Farm Fire & Cas. v. Aquila Inc. , 718 N.W.2d 879, 883 (Minn. 2006) (reviewing de novo the interpretation of a statute of repose).
I.
The Legislature created a statute of repose for improvements to real property to eliminate suits against those involved in constructing improvements who have "completed their work, turned the improvement to real property over to the owners, and no longer have any interest or control in it." Sartori v. Harnischfeger Corp. , 432 N.W.2d 448, 454 (Minn. 1988) (recognizing that the statute protects architects, designers, and contractors); see Calder v. City of Crystal , 318 N.W.2d 838, 843 (Minn. 1982) (recognizing that the statute protects manufacturers). By creating a period of repose, the statute "helps avoid litigation and stale claims which could occur many years after an improvement to real property has been designed, manufactured and installed." Sartori , 432 N.W.2d at 454. To help eliminate problems that arise from litigating old claims, the Legislature placed "a finite period of time in which actions against certain parties may be brought." Id.
The statute of repose for improvements for real property provides in relevant part:
Subdivision 1.... (a) Except where fraud is involved, no action by any person in contract, tort, or otherwise to recover damages for any injury to property, real or personal , or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, shall be brought against any person performing or furnishing the design, planning, supervision, materials , or observation of construction or construction of the improvement to real property ... more than two years after discovery of the injury, nor in any event shall such a cause of action accrue more than ten years after substantial completion of the construction .
....
(e) The limitations prescribed in this section do not apply to the manufacturer or supplier of any equipment or machinery installed upon real property.
Minn. Stat. § 541.051, subd. 1(a), (e) (emphasis added). Simply put, if the subdivision 1(e) exception applies, the time limitations of subdivision 1(a) do not.[4]
Here, the parties dispute only whether the heat-recovery ventilator, which contains McMillan's motor,[5] is "equipment or machinery installed upon real property" that is excepted from the statute's time *516 bar. See Minn. Stat. § 541.051, subd. 1(e). The court of appeals held that the exception in subdivision 1(e) applied-and the statute of repose did not bar Great Northern's claims-because the ventilator was both "equipment" and "machinery" under the dictionary definitions of those words. Great Northern , 895 N.W.2d at 259. McMillan asserts that this interpretation is overly broad and would "extend the exception to many, if not all, of the constituent parts of homes and other structures."
We now consider, for the first time, the meaning of the exception in subdivision 1(e). We interpret this statute's language to "ascertain and effectuate" the Legislature's intent. Minn. Stat. § 645.16 (2016). "If the Legislature's intent is clear from the statute's plain and unambiguous language, then we interpret the statute according to its plain meaning without resorting to the canons of statutory construction." State v. Struzyk , 869 N.W.2d 280, 284-85 (Minn. 2015) (quoting State v. Rick , 835 N.W.2d 478, 482 (Minn. 2013) ). To determine whether the phrase "equipment or machinery installed upon real property" is ambiguous, we consider whether it can be "subject to more than one reasonable interpretation." Christianson v. Henke , 831 N.W.2d 532, 537 (Minn. 2013). In doing so, we construe the law to "give effect to all its provisions." Minn. Stat. § 645.16 ; Allan v. R.D. Offutt Co. , 869 N.W.2d 31, 33 (Minn. 2015) (stating that we interpret statutes so that "no word, phrase, or sentence [is] superfluous, void, or insignificant" (citation omitted) ). We presume that the "[L]egislature intends the entire statute to be effective and certain." Minn. Stat. § 645.17(2) (2016).
If the phrase "equipment or machinery installed upon real property" is unambiguous, then the plain meaning of the statute's words and phrases controls. In ascertaining this plain meaning, we construe "words and phrases ... according to rules of grammar and according to their common and approved usage." Minn. Stat. § 645.08(1) (2016). Here, where the Legislature has not provided definitions of the relevant terms, we may consider dictionary definitions to determine a word's common usage. See Shire v. Rosemount, Inc. , 875 N.W.2d 289, 292 (Minn. 2016). The "relevant definition of a term depends on the context in which the term is used." State v. Nelson , 842 N.W.2d 433, 437, n.2 (Minn. 2014) ; see also Deal v. United States , 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993) ("[T]he meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used."). In the context of the statute of repose, in particular, we "strive to give effect to the plain meaning of the words of the statute [of repose] without resorting to technical legal constructions of its terms." Siewert v. N. States Power Co. , 793 N.W.2d 272, 286 (Minn. 2011) (internal quotation marks omitted) (quoting Pac. Indem. Co. v. Thompson-Yaeger, Inc. , 260 N.W.2d 548, 554 (Minn. 1977), superseded by statute , Minn. Stat. § 541.051 (1980) ).
At the outset, we note that the statute of repose in subdivision 1(a) is applicable only if the heat-recovery ventilator is an "improvement to real property." Minn. Stat. § 541.051, subd. 1(a). In Pacific Indemnity Co. , we defined an "improvement" as "a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." 260 N.W.2d at 554 (quoting Kloster-Madsen, Inc. v. Tafi's, Inc. , 303 Minn. 59, 226 N.W.2d 603, 607 (1975) ). Here, the parties stipulate that the heat-recovery ventilator was an "improvement to real property" under subdivision 1(a). Accordingly, the *517 time bar of subdivision 1(a) applies unless the heat-recovery ventilator fits the exception to the time bar set forth in subdivision 1(e). Minn. Stat § 541.051, subd. 1(e).
Interpreting the plain meaning of subdivision 1(e), we first consider the interplay between subdivisions 1(a) and 1(e). Subdivision 1(a) protects persons furnishing "materials" for an improvement to real property from being sued more than 10 years after substantial completion of the construction. "Material" broadly means "[t]he substance or substances out of which a thing is or can be made." The American Heritage Dictionary of the English Language 1083 (5th ed. 2011). Because "equipment or machinery installed upon real property" must be an improvement to real property to fall under section 541.051, the Legislature must have intended "equipment" and "machinery" to be specific types of "materials." Subdivisions 1(a) and 1(e) therefore distinguish among types of materials by separating the "equipment" and "machinery" in subdivision 1(e) from all other "materials" covered by subdivision 1(a). Accordingly, whether a material is part of the subset of "equipment or machinery" depends upon the specific nature and function of the material.
With this in mind, we interpret the exception for "equipment or machinery installed upon real property" under subdivision 1(e) to determine whether the ventilator containing McMillan's motor falls under the exception or the general rule. We construe the nature and function of the materials enumerated in the time-bar exception narrowly to ensure that the exception does not swallow the general rule, leaving the term "materials" in subdivision 1(a) meaningless. See Minn. Stat. § 645.16 (providing that we must "give effect to all [of a law's] provisions"); Aquila , 718 N.W.2d at 886 ("[A]ny exception to the statute of repose should be used 'only in exceptional circumstances.' " (citation omitted) ).
To determine whether the time-bar exception under subdivision 1(e) applies, we need only decide that the heat-recovery ventilator is either "equipment or machinery installed upon real property." Minn. Stat. § 541.051, subd. 1(e) (emphasis added); see State v. Loge , 608 N.W.2d 152, 155 (Minn. 2000) (describing how "two alternate concepts" in a statute were "separated by the disjunctive 'or,' " which "require[s] that only one of the possible factual situations be present in order for the statute to be satisfied"). Because we conclude that the ventilator is "machinery," we need not determine whether it is also "equipment." Accordingly, we leave the definition of "equipment" for a later case. See State v. Webb , 440 N.W.2d 426, 431 (Minn. 1989) ("Because of our disposition of this issue, we need not reach appellant's other assignments of error.").
"Machinery" refers to "[m]achines or machine parts considered as a group" and "the working parts of a particular machine." The American Heritage Dictionary of the English Language 1051 (5th ed. 2011). A "machine," in turn, is defined as a "device consisting of fixed and moving parts that modifies mechanical energy and transmits it in a more useful form" or "[a] system or device for doing work ... together with its power source and auxiliary equipment." Id. at 1050. Considering these definitions of "machinery" and "machine" in the context of the statute as a whole, we conclude that the language in section 541.051, subdivision 1(e), is unambiguous. See Minn. Stat. § 645.16 ; Christianson , 831 N.W.2d at 537 ("If the meaning of [a word] is plain, then our inquiry ends.").
Applying this definition of "machinery," we hold that the heat-recovery ventilator containing McMillan's motor is "machinery"
*518 under subdivision 1(e) because the ventilator satisfies either definition of "machine." The ventilator consists of a motor, fans, air filters, and a heat-exchange core that modify and transmit mechanical energy to efficiently regulate a home's climate. And when connected to an electrical outlet, the ventilator works to recover heat and remove humidity from the home.
Holding that the heat-recovery ventilator is exempt from the statute of repose makes sense. Unlike "materials" that are furnished for real property improvements, machinery and its components often carry warranties that extend a manufacturer's relationship with end users beyond construction. See Cape Henry Towers, Inc. v. Nat'l Gypsum Co. , 229 Va. 596, 331 S.E.2d 476, 480 (1985) (stating that "machinery" is "subject to close quality control at the factory and may be made subject to independent manufacturer's warranties"). Because of this relationship, statutes of limitations that typically apply for products-liability actions should apply here-and not the statute of repose for improvements to real property.
Instead of applying a plain-language analysis, McMillan contends that we should follow a rule previously articulated by the court of appeals and federal courts applying Minnesota law: equipment and machinery are products that assist in some operation, activity, or particular use of a building, as opposed to products that are ordinary building materials incorporated into a building's structure and then become part of the building itself. See, e.g. , Red Wing Motel Inv'rs v. Red Wing Fire Dep't , 552 N.W.2d 295, 297 (Minn. App. 1996) (citing Cape Henry , 331 S.E.2d at 480 ), rev. denied (Minn. Aug. 20, 1996); see also Integrity Floorcovering, Inc. v. Broan-Nutone, LLC , 521 F.3d 914, 919-21 (8th Cir. 2008). Applying this definition, McMillan argues that the statute of repose under section 541.051, subdivision 1(a), bars Great Northern's claims because the ventilator is more like "ordinary building materials" than "equipment or machinery" because the ventilator became a part of home's HVAC system, which is a part of the home's structure.
We do not adopt this rule because the statute's plain language requires us to consider the material's nature and function, not its degree of integration into a structure. See J.D. Donovan, Inc. v. Minn. Dep't of Transp. , 878 N.W.2d 1, 13 (Minn. 2016) ("[W]e do not, and cannot, add to a statute words intentionally or inadvertently omitted by the Legislature."); see also Pac. Indem. Co. , 260 N.W.2d at 554 (rejecting a technical property fixture analysis in favor of a "common-sense interpretation" when determining what materials are part of an "improvement to real property"). Tellingly, this integration rule was never rooted in the statute's plain language. The court of appeals adopted the rule from the Virginia Supreme Court's interpretation of a similar law in Virginia; the Virginia Supreme Court had based its rule on legislative history, not the statute's plain language. See Red Wing Motel Inv'rs , 552 N.W.2d at 297 (citing Cape Henry Towers , 331 S.E.2d at 478-80 ). Although legislative history can help us to clarify the Legislature's intent when a statute's language is ambiguous, we do not consider legislative history if the statute's language is clear on its face. See Premier Bank v. Becker Dev., LLC , 785 N.W.2d 753, 759 (Minn. 2010).
We therefore apply the statute's plain language and hold that section 541.051, subdivision 1(a), does not bar Great Northern's claims against McMillan. Because the heat-recovery ventilator fits the exception in subdivision 1(e) for "machinery installed upon real property," the time bar of the statute of repose is inapplicable. Accordingly, *519 we affirm the court of appeals and remand this case to the district court for further proceedings on Great Northern's claims of product liability, breach of warranty, and negligence.
II.
Because we conclude above that the statute of repose does not bar Great Northern's claims, we next consider whether McMillan, as a product manufacturer, had a post-sale duty to warn of fires associated with its motors.
A.
Whether a legal duty to warn exists is a question of law for the court. Germann v. F.L. Smithe Mach. Co. , 395 N.W.2d 922, 924 (Minn. 1986). We review this question of law de novo. See Foss , 766 N.W.2d at 320 ("The existence of a legal duty ... is a question of law that is reviewed de novo.").
We have established that manufacturers have a duty to warn of a safety hazard that is present at the time of sale. Gray v. Badger Mining Corp. , 676 N.W.2d 268, 274 (Minn. 2004). This pre-sale duty to warn attaches when "the manufacturer or the seller of the product has actual or constructive knowledge of danger to users." Id. We have also recognized that a manufacturer can have a post-sale duty to warn when a manufacturer discovers a hidden defect after the time of sale. Hodder v. Goodyear Tire & Rubber Co. , 426 N.W.2d 826, 833 (Minn. 1988). But unlike the pre-sale duty to warn, we have not established a general rule to describe the circumstances under which the post-sale duty to warn arises. See id.
In Hodder , we recognized the existence of a post-sale duty to warn of safety hazards and limited its application to "special cases." Id. We concluded in Hodder that Goodyear had a post-sale duty to warn about the dangers of truck tire rims that occasionally exploded. Id. at 829. We provided reasons for this decision, but we did not clarify which criteria are determinative or explicitly categorize them. We stated:
[I]t became evident by the late 1950's that K-rims could be temperamental; that the margin for error in servicing the K-rim assembly was dangerously small and it might explosively separate with seemingly little provocation; that when explosions did occur, serious injury or death usually resulted; and, therefore, that great care was required in the handling and servicing of K-rims. Further, Goodyear has continued over the years in the tire rim business, and, although all K-rim production was discontinued by 1969, Goodyear continued to advertise its K-rims as late as 1977 [ (5 years before the injury in 1982) ], and has continued to sell tires and tubes for use with used K-rims. Finally, Goodyear undertook a duty to warn of K-rim dangers.
Id. at 833. Accordingly, we held that "under these circumstances," Goodyear "had a continuing duty to instruct and to warn, so that users of used tire rims would be apprised of safety hazards which, at an earlier time, were not fully appreciated." Id.
Our decision in Hodder was limited to the facts of that case and did not establish a general rule or test. See Niccum v. Hydra Tool Corp. , 438 N.W.2d 96, 100 (Minn. 1989) ("We specifically limited the duty to warn imposed in Hodder to the facts of that case involving a subsidiary corporation."). We now consider a general rule. Specifically, we consider two different rules for when a post-sale duty to warn arises: (1) a balancing test set forth and applied by federal courts interpreting the factual circumstances in Hodder , and (2) the rule set forth in the *520 Restatement (Third) of Torts: Products Liability § 10 (Am. Law. Inst. 1998).
The first approach is set forth by federal courts applying Minnesota law; these cases have established a multi-factor test based on the circumstances in Hodder . The most common interpretation of Hodder , asserted by both parties here, originates in Ramstad v. Lear Siegler Diversified Holdings Corp. , 836 F.Supp. 1511, 1517 (D. Minn. 1993). The federal district court in Ramstad distilled the circumstances in Hodder into five factors to determine whether a post-sale duty to warn exists:
(1) the defendant's knowledge of a product, including knowledge that the product may become defective with little provocation;
(2) the hidden nature of the danger;
(3) the potential for serious injury or death when the danger manifested;
(4) whether the defendant remained in that same line of business, continued to sell the product, and had advertised the product recently; and
(5) whether the defendant had, on its own accord, warned of the product's danger.
See id . at 1517 ; see also Gardner v. Brillion Iron Works, Inc. , 120 F.Supp.3d 928, 940-41 (D. Minn. 2014) (applying these factors); McDaniel v. Bieffe USA, Inc. , 35 F.Supp.2d 735, 740 (D. Minn. 1999) (same).
The second approach for considering whether a post-sale duty to warn exists comes from the Restatement (Third) of Torts: Products Liability § 10. To better limit the post-sale duty to warn to "special cases," as required by Hodder , we adopt this rule. Section 10 provides:
(a) One engaged in the business of selling or otherwise distributing products is subject to liability for harm to persons or property caused by the seller's failure to provide a warning after the time of sale or distribution of a product if a reasonable person in the seller's position would provide such a warning.
(b) A reasonable person in the seller's position would provide a warning after the time of sale if:
(1) the seller knows or reasonably should know that the product poses a substantial risk of harm to persons or property; and
(2) those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm; and
(3) a warning can be effectively communicated to and acted on by those to whom a warning might be provided; and
(4) the risk of harm is sufficiently great to justify the burden of providing a warning.
Under this rule, the post-sale duty to warn is a negligence standard, which outlines conjunctive factors for when a reasonable person in the same situation would provide a warning. Id. cmt. b.
We decide to adopt the Restatement rule for several reasons. First, the rule's factors are conjunctive, and a plaintiff must establish all the requirements for the duty to attach. Id. The rule therefore promotes consistency, as compared to the weighing of five factors on a case-by-case basis. The conjunctive standard will also help clarify any confusion that has developed about how to weigh particular factors. See McDaniel , 35 F.Supp.2d at 741 (stating that courts have no guidance on "what factors are determinative in deciding when to impose a post-sale duty to warn" under Hodder ).[6]
*521 Second, the Restatement rule avoids the "undertaking a warning" consideration from Hodder that may incent potential defendants to forego a warning in hopes of avoiding a post-sale duty to warn. See Hodder , 426 N.W.2d at 833 ("Goodyear undertook a duty to warn of K-rim dangers...."). The logic from Hodder that gave rise to this consideration seems to be that, if the defendant believed it necessary to provide a warning to its customers, that action shows that the defect was deserving of a legal duty to warn. But the reverse of this logic could result in a perverse incentive: a manufacturer may well decide not to issue a warning because it believes that inaction will improve its chances of a court concluding that no post-sale duty exists. The Restatement rule avoids this potential problem by omitting consideration of whether a manufacturer voluntarily undertook a duty to warn. It instead focuses on a manufacturer's ability to contact consumers or purchasers and on the reasonableness of the manufacturer's actions in light of all the factors. These considerations are more appropriate and avoid creating an incentive that may undermine consumer safety.
Third, the Restatement rule's reasonableness standard also provides guidance on how courts can address various entities in a product's chain of distribution. Cases interpreting Hodder have not clarified whom a manufacturer must warn when that manufacturer had no contact with the ultimate purchasers or consumers. The Restatement rule, however, does clarify that the rule's "reasonableness standard" applies to each member of the chain of distribution, and "it is possible that one party's conduct may be reasonable and another's unreasonable." Restatement (Third) of Torts: Products Liability § 10, cmt. b.
This reasonableness standard parallels our general law regarding warnings, in which the duty to warn may depend upon a product user's knowledge and a party's connection to product consumers. For example, "there is no duty to warn if the user knows or should know of potential danger." Minneapolis Soc. of Fine Arts v. Parker-Klein Assocs. Architects, Inc. , 354 N.W.2d 816, 821 (Minn. 1984), overruled on other grounds by Hapka v. Paquin Farms , 458 N.W.2d 683, 686-87 (Minn. 1990). Nor does the duty to warn extend to manufacturers who "had no opportunity or duty to warn the ultimate consumer." Hill v. Wilmington Chem. Corp. , 279 Minn. 336, 156 N.W.2d 898, 902 (Minn. 1968) (concluding that the manufacturer of an ingredient had "no opportunity or duty to warn the ultimate consumer" when it sold its ingredient to a manufacturer who did the producing and packaging of the product). The reasonableness standard therefore allows a flexible analysis that accommodates for parties acting at different levels of the chain of distribution.
Finally, the Restatement rule is consistent with our conclusion that a post-sale duty existed in Hodder . Like Hodder , the Restatement rule requires that a defendant must have had knowledge of the product's defect, the defect must have been hidden, and the defect must have had the potential to cause significant harm.
*522 Restatement (Third) of Torts: Products Liability § 10(b)(1), (4). Also similar to Hodder , the Restatement rule requires that "those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm" and that "a warning can be effectively communicated to and acted on by those to whom a warning might be provided." Id. § 10 (b)(2), (3) ; see Hodder , 426 N.W.2d at 833. The Restatement rule's requirements therefore correspond to the circumstances in Hodder regarding continuation in the business and undertaking a duty to warn. See 426 N.W.2d at 833.
B.
Applying the Restatement rule to the undisputed facts here, we conclude as a matter of law that McMillan, the manufacturer of the ventilator's motor, did not have a post-sale duty to warn. Although McMillan's actions satisfy two of the Restatement's requirements, McMillan does not meet them all. First, McMillan knew that the product posed a substantial risk of harm to persons or property because Nutech informed McMillan of fires in the ventilators sometime after 2003. See Restatement (Third) of Torts: Products Liability § 10(b)(1). When the fire at the Eden Prairie home occurred, around 10 other fires had occurred in other ventilators containing McMillan motors. In 2006, Nutech further informed McMillan that it was conducting a voluntary inspection program for its ventilators through the Canadian Standards Association. At the time, the cause of the fires was uncertain, but Nutech's fire investigation report theorized that it may be possible for a motor failure to cause a fire within an excessively oiled motor. After reports of more fires, Nutech conducted a Canadian recall in June 2010, but Nutech did not pursue a recall in the United States. McMillan took no part in either recall, and it did not allow Nutech to use its name in the Canadian recall. Based on these facts, we conclude, and McMillan does not dispute, that McMillan knew that the product posed a risk of harm to persons or property.
Second, the "risk of harm [was] sufficiently great to justify the burden of providing a warning." Id. § 10(b)(4). The fires linked to the ventilators did not cause any deaths, but the fires caused substantial property damage. McMillan concedes that fires causing substantial property damage are serious injuries.[7]
But McMillan could not identify "those to whom a warning might be provided," nor could it effectively communicate a warning to consumers using the ventilators containing McMillan's motors. Id. § 10(b)(2)-(3). McMillan did not have any records regarding the ventilators' distribution or the consumers using the ventilators because McMillan's only customer was Nutech, the ventilator's manufacturer. Nutech received motors from McMillan, assembled the ventilators, and distributed them to Canadian consumers and Honeywell, which then distributed the ventilators to consumers in the United States. McMillan therefore could not reasonably predict where and by whom the ventilators containing its motors would be purchased or used. Moreover, McMillan knew that Nutech was aware of the fires and was actively warning of the product's danger, at least in Canada.
Therefore, because the Restatement rule that we adopt here is conjunctive and Great Northern has not proven all four *523 criteria, McMillan did not have a post-sale duty to warn about the risks associated with its motors that were installed into Nutech's ventilators.
CONCLUSION
For the foregoing reasons, we affirm the court of appeals' decision that the heat-recovery ventilator containing McMillan's motor is "machinery" that meets the exception to the statute of repose found in section 541.051, subdivision 1(e). Accordingly, we remand to the district court for further proceedings on Great Northern's claims of product liability, breach of warranty, and negligence. Concluding that McMillan had no post-sale duty to warn of potential hazards with its motors, we reverse the court of appeals' decision regarding that claim.
Affirmed in part, reversed in part, and remanded.

Great Northern also sued Nutech and Honeywell in its subrogation action. "Subrogation" is the "principle under which an insurer that has paid a loss under an insurance policy is entitled to all the rights and remedies belonging to the insured against a third party with respect to any loss covered by the policy." Subrogation , Black's Law Dictionary (10th ed. 2014).

In general, a statute of repose "bar[s] any suit that is brought after a specified time since the defendant acted ..., even if this period ends before the plaintiff has suffered a resulting injury." Statute of Repose , Black's Law Dictionary (10th ed. 2014). A statute of repose is different than a statute of limitations. Specifically, "a statute of limitations limits the time within which a party can pursue a remedy (that is, it is a procedural limit), whereas a statute of repose limits the time within which a party can acquire a cause of action (thus it is a substantive limit)." In re Individual 35W Bridge Litig. , 806 N.W.2d 820, 831 (Minn. 2011) (quoting Weston v. McWilliams & Assoc. , 716 N.W.2d 634, 641 (Minn. 2006) ). Section 541.051, subdivision 1(a), includes both a 10-year statute of repose and a 2-year statute of limitations.

Like McMillan, Nutech and Honeywell also moved for summary judgment based on the statute of repose. Unlike McMillan, the district court concluded that a genuine issue of material fact existed as to whether Nutech and Honeywell owed a post-sale duty to warn. Accordingly, the district court denied the parties' motions for summary judgment. Nutech and Honeywell have since settled their claims with Great Northern.

Even if the time limitations of subdivision 1(a) do not apply, claims are still subject to the time limitations set forth elsewhere. See, e.g. , Minn. Stat. § 336.2-725 (2016) (establishing a 4-year statute of limitations for contract for sale claims); Minn. Stat. § 541.05, subd. 1 (2016) (establishing a 6-year statute of limitations for contract and negligence claims, a 4-year statute of limitations for strict liability claims, and a 6-year statute of limitations for claims of fraud).

The parties agree that we must consider whether the ventilator as a whole, and not simply the motor, is "equipment or machinery installed upon real property" under subdivision 1(e). The parties also agree that as the manufacturer of the ventilator's motor-a component part of the ventilator-McMillan is subject to section 541.051, subdivision 1(a) and 1(e), to the extent that the ventilator is a "material" covered or exempted under the statute. See Calder , 318 N.W.2d at 843 ("[A] manufacturer of component parts falls within the statute's coverage as a supplier of materials used in construction of the improvement.").

A few decisions have de-emphasized certain factors that we recognized in Hodder and as outlined in Ramstad . For example, the McDaniel court determined that a case was "special" because of a product's particular nature. 35 F.Supp.2d at 742. It concluded that the fourth and fifth factors from Ramstad were not determinative in that case, which involved a helmet-a "mass-produced, widely produced product" that consumers purchased to protect themselves. Id. McDaniel therefore focused on the first three factors-the manufacturer's knowledge of the harm, the hidden danger of the harm, and the seriousness of the harm-despite the absence of the fourth and fifth factors. See id.

McMillan concedes that property damage is considered to be a serious injury under the federal courts' interpretation of Hodder . The harm element is essentially the same in the Restatement rule.